UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>vs.<br><br>DANIEL REYNOLD DEJAGER,<br>*a/k/a Daniel Reynold, aka Daniel Miester,*<br>*a/k/a Danichi,*<br><br>           Defendant. | NO. 21-CR-00040-RJJ<br><br>DEFENDANT DEJAGER'S SENTENCING MEMORANDUM AND BRIEF IN SUPPORT OF MOTION FOR DOWNWARD VARIANCE |

## INTRODUCTION

On October 7, 2021, Mr. DeJager entered guilty pleas to Count I, Conspiracy to Operate an Unlicensed Money Transmitting Business in violation of 18 USC § 371 and 1960 and Count 4, Money Laundering in violation of 18 USC § 1956(a)(1)(A)(i), (B)(i). Mr. DeJager stipulated to the facts set forth in the plea agreement as the basis for his guilty plea, and he acknowledges his misconduct. Mr. DeJager also submitted a letter to Probation Officer Gonzales providing his background and how he became involved in The Geek Group. *See Exhibit A.* Having fully accepted responsibility for his conduct in this case, Mr. DeJager humbly appears before this Court for sentencing.

## BACKGROUND INFORMATION

Unlike many individuals who might appear before this Honorable Court for sentencing, Mr. DeJager's upbringing was stable. He grew up in a Christian home, his parents are married and he has six siblings. In his letter to the Court, he chronicles his upbringing, including the stress within his family, how he perceived others viewed him, and his concerns that he really didn't fit in, based upon his belief of others' expectation.

Because of Mr. DeJager's conviction, he is currently unemployed. He is single, with hopes of one day marrying and raising a family. As repeatedly referenced in the letters submitted on his behalf, Mr. DeJager is viewed by his friends and family as a wonderful individual who they cannot believe could be involved in criminal misconduct, but also readily recognize that his somewhat sheltered upbringing, and need to be accepted, likely fueled his desire to be part of The Geek Group, even after it operated outside the law.

To Mr. DeJager's credit, he acknowledges that the allure of belonging to this organization clearly clouded his judgment. From Mr. DeJager's involvement with The Geek Group until today, Mr. DeJager has matured, both spiritually and emotionally. What is also clear is that today's Daniel DeJager is not the same Daniel DeJager previously involved with The Geek Group.

As this Court knows from Mr. DeJager's case and his co-defendants, he became involved with Bitcoin through his involvement with The Geek Group. The monetary benefits of Bitcoin was a means to keep The Geek Group operational. Unfortunately, Mr. DeJager, and the other co-defendants, allowed

the ends of supporting The Geek Group to justify the means, downplaying, if not simply ignoring, their conduct. Clearly, in retrospect, Mr. DeJager acknowledges that what he did was unlawful.

As the Court can also see from the many letters written on Mr. DeJager's behalf, most focus on Mr. DeJager as an individual ready to help anyone who asks, and continuing to help those who don't ask.

Respectfully, Mr. DeJager stands before you as a more humble person than at any time in his life. He understands that he faces legal consequences for his actions, and will accept what the Court imposes. He is optimistic the Court, upon reviewing the Presentence Report, will concur with Ms. Gonzales' assessment that probation is the appropriate sanction, but also understands that his sentence range allows for the possibility that Mr. DeJager may be sentenced to prison. He fully understands that he created the situation he currently faces.

## SENTENCING RECOMMENDATION BY DEFENDANT

Mr. DeJager urges that the sentencing framework is succinctly set forth as follows: "While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines when determining the appropriate sentence in a given case, the Court is not bound by that range. Indeed, the Supreme Court has repeatedly reminded sentencing courts that, `The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.' Nelson v. United States, 129 S.Ct. 890, 892 (2009)(underlined emphases in original); see also Rita v. United States 127 S.Ct. 2456, 2465 (2007) (instructing that the only `presumption of reasonableness' that applies to a Guidelines sentence is `an appellate court presumption,' not applicable in the initial sentencing analysis conducted by the District Court). In

fact, the sentencing court has "the legal authority not to apply the Guidelines at all (for they are advisory)." Dorsey v. United States, Corey A. Hill, 132 S.Ct. 2321, 2330 (2012).

While this Court must consider the recommendations of the advisory Guidelines, the Court may not presume that those recommendations are reasonable. Instead, the Court must treat the recommended Guidelines sentence as only one among numerous factors.

Sentencing courts are free to disagree with the Guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a). This includes the freedom to disagree with "policy decisions" of congress of the Sentencing Commission that are contained in the Guidelines. See Pepper v. United States, 131 S.Ct. 1229, 1241 (2011) ("post-Booker decision make clear that a district court may tailor a non-Guidelines sentence in light of other statutory considerations"); Spears v. United States, 129 S.Ct. 840, 843 (2009) (confirming Kimbrough's holding that courts may vary from particular guideline because of a policy disagreement with that guideline) (per curiam)."

With the above framework in mind, Mr. DeJager urges this Court to sentence him to a two-year term of probation, as recommended by Ms. Gonzales. Such sentence satisfies the 18 USC § 3553 factors, is appropriate for Mr. DeJager in this case, and considers his position in life both before and after he was convicted of these criminal offenses.

## I. THE COURT SHOULD SENTENCE MR. DEJAGER TO A TERM OF PROBATION FOR HIS OFFENSE.

Although Mr. DeJager was clearly involved in illegal conduct, unlike most criminal defendants, his goal was to belong to an organization as a valued member to do good - further The Geek Group's mission of providing assistance to others. Unfortunately, although The Geek Group's goals didn't change, the manner in which to fund those goals resulted in the criminal misconduct that occurred. As a result of Mr. DeJager's actions, he is now a convicted felon, which, in his line of employment, imposes a very serious impediment to future employment. But the positive result from this situation is that he now reorganizes and accepts that he doesn't need to belong to a "group" to be considered a valued individual.

As this Court is aware, the statutory factors are set forth within 18 U.S.C. § 3553(a):

> (a) Factors To Be Considered in Imposing a Sentence.
>
> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and

>  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> …
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Mr. DeJager agrees with the Guideline calculations set forth in the presentence report. As such, given his offender score of I and offense level of 31, his standard range sentence is 108 to 135 months within the Bureau of Prisons.

Probation is recommending two years probation, which, respectfully, the defense supports. Such sentence appropriately considers the 18 USC § 3553 factors outlined above. The Government's recommendation for a custodial sentence, although understandable, is greater than necessary to satisfy the § 3553 factors. Respectfully, and as set forth below, a sentence of probation is the appropriate sentence for Mr. DeJager.

> A. *The Nature & Circumstances of the Offense and the History and Characteristics of the Defendant.*

The letters accompanying this memorandum set forth Mr. DeJager's character. He is viewed as a wonderful son, brother, relative, employee, and friend. Throughout his life, even when shrouded in self-doubt, he has always been an individual who could be counted on to help others and not expect any recognition.

Although a narrow view of Mr. DeJager is that he is simply a felon, the defense suggests that his characteristics are best exemplified as set forth within

the letters accompanying this memorandum. Further, he has attempted to explain the allure of The Geek Group and how he became involved with the organization. In many ways, this was the type of social interaction he longed for, a social group where he felt welcomed, appreciated, and comfortable: to simply be himself without any concerns of rejection. It was from this longing to belong to a group that appreciated him that led him to his current situation. Although clearly not an excuse, Mr. DeJager's explanation of his involvement assists in determining the appropriate sentence.

      B.   *The Seriousness of the Offense, the Need to Promote Respect for the Law and the Need to Provide Just Punishment.*

Clearly, the offenses Mr. DeJager entered guilty pleas to are serious, but the offenses, alone, need to be understood through a review of the factual background. The Geek Group was not established to become a criminal organization. As Mr. DeJager summarized in his letter, he perceived the Bitcoin phenomena as the wild west of financial markets where rules didn't seem to apply. With that mindset, that The Geek Group failed because of its improper entrance into the Bitcoin market isn't a surprise. But, as opposed to simply acknowledging he committed a crime, he not only accepted responsibility for his actions but also tried to explain how he came to be in his current position. He does not blame his co-defendants for his predicament nor does he sugar coat his conduct. He engaged in criminal activity, and the 2020 knock on the door by the Federal Agents was his awakening. As might be noted from several letters, Mr. DeJager's pseudo arrogance has been replaced with humility. As this Court

likely knows, through humility comes wisdom and understanding. Mr. DeJager has truly been humbled.

What constitutes "just" punishment must be individualized. Mr. DeJager has been a productive and useful member of society his entire life. Even when he was astray, his Geek Group involvement did not interfere with his core beliefs in his family, friends, and church. That interaction has remained constant and will continue to be a focus of his life. He has already been punished through the shame involved with his behavior, his felony conviction, and loss of meaningful employment. Mr. DeJager knows that his conduct was wrong, but just punishment does not always require incarceration as requested by the Government. "Just" punishment can be accomplished by two-years of probation as such sentence provides respect for the law given Mr. DeJager' offenses.

### C. The Need to Afford Adequate Deterrence.

The sentence, as outlined above, provides adequate deterrence. No incarceration is needed to further deter Mr. DeJager from future negative behavior.

### D. The Need to Protect the Public.

The public will be safe regardless of the sentence the Court imposes. Given the impact this event has had on Mr. DeJager, including the loss of his career, he will not reoffend.

### E. The Need to Provide the Defendant with Education or Vocational Training or Rehabilitation.

This factor does not apply to Mr. DeJager. He has received adequate training over the years, which he will once again put to use once this matter is

behind him. He is a gifted software engineer, and will likely succeed in the future.

> F. *The Need to Avoid Disproportionality Among Defendants with Similar Records who have been Found Guilty of Similar Conduct.*

This Court has the benefit of previously sentencing one of Mr. DeJager's co-defendants, and will sentence the other two after Mr. DeJager. Despite the Government's position, given Mr. DeJager's position within The Geek Group, a custodial sentence is not necessary. Rather, a sentence of probation is reasonable and appropriate, and avoids disproportionality.

> G. *The Need to Make Restitution to Victims.*

Mr. DeJager is not aware of any restitution request.

## **CONCLUSION**

As this Court is fully aware, our Supreme Court allows this Court, like any District Court, to fashion the appropriate sentence in any criminal case. This Court has been appropriately advised of the guideline range, which is required, but is free to impose the sentence this Court deems appropriate for Mr. DeJager.

Respectfully, the defense urges that upon this Court's consideration of the § 3553 factors, the sentence imposed on his co-defendant, probation's recommendation, and the numerous letters in support, a sentence of two years probation is appropriate. Mr. DeJager has been cooperative throughout this process, and no greater penal sanction is necessary.

RESPECTFULLY SUBMITTED this 14th day of February, 2022.

HESTER LAW GROUP, INC., P.S.
Attorney for Daniel DeJager

By:  */s/ Brett A. Purtzer*
Brett A. Purtzer
WSB #17283
1008 S. Yakima, #302
Tacoma, WA 98405

## CERTIFICATE OF SERVICE

Lee Ann Mathews, hereby certifies under penalty of perjury under the laws of the State of Washington, that on the date set forth below, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record for the plaintiff and co-defendants, if any, and hereby certify that I have mailed the document by U.S. Postal Service to Daniel DeJager, defendant.

Signed at Tacoma, Washington this 14th day of February, 2022.

                                                       /s/ Lee Ann Mathews
                                                       Lee Ann Mathews

To the Honorable Robert J. Jonkers.

Greetings, Your Honor. I am Daniel Reynold DeJager, I hope you will allow me to tell you about this case from my perspective.

I grew up in a large Christian family, and am the eldest of seven. My parents were your typical stay-at-home-mom and working professional dad, who go to church on Sundays. Our religious convictions also resulted in them deciding to homeschool us. This actually works well in large families as the elder siblings can soon start helping to monitor, teach, raise, and support the younger siblings. This was especially important in our family, as my youngest sister was born with a neurological disorder and has always needed extra help, which we were all usually willing to provide. Mom is a well educated nursing school graduate; and between comprehensive curriculum, co-ops with other homeschooling families, and her father helping with math tutoring; she managed to homeschool all of us through junior high. For highschool we took advantage of our state's advanced placement program that allowed us to get highschool credit for college work. With the exception of my disabled sister, we all got at least an associates degree with reasonable to good marks, and Beth did graduate highschool, and now monitors and maintains stock rotation for a local drugstore.

Among the typical Christian values instilled in us, none were more important than trusting and following God. Our family motto is Proverbs 3:5-6. "Trust in the Lord with all your heart and lean not on your own understanding. In all your ways acknowledge Him and he will direct your paths." Our faith is very important to us, and we try to lead a life that reflects that, so it's no surprise that we were also raised knowing the importance of honesty in word and deed, generosity, kindness, and service to others where possible.

Mom and Dad have always lived together, and still do, but we functionally grew up without a father.

I remember when we were younger that we would always eat dinner around the table, as a whole family, and dinner would happen no sooner than Dad coming home. Dinner was usually a simple but filling meal around which we would discuss the day. After dinner, Dad would read devotions and we'd pray. As time went on, he started getting angrier and angrier, and would often lash out at his captive audience for his latest talk-radio or news induced frustration.

Eventually Mom would leave the meal on the stove and we'd come help ourselves and go our ways. Dad also stopped working on his model trains and just started playing his favorite computer games from the time he got home until bedtime, and often all weekend too. About the only interaction we were left with was the two trips to church on Sundays for morning service and evening service, or the after church Sunday drive we also slowly took less and less frequently. But eventually those drives too became tainted as we were again a captive audience for his latest irritation. Outside of being our family's financial support, and taking us to church on Sunday, Dad felt his responsibilities stopped the moment he walked in the door.

So, Mom raised us. With the exception of some DIY skills that I learned from Dad on the few occasions Mom convinced him to do something, I learned everything else from my Mom and Grandpa. Being the eldest, and effectively having no father, I started filling the father role even as early as 10. As I grew older and more capable, I assumed more and more responsibilities that would normally have fallen on Dad. Home maintenance, vehicle maintenance, home remodeling, sibling supervision, correction, tutoring; you name it. If it was something that needed doing, I probably did it. I even built walls upstairs--complete with wiring, for more bedrooms, and rebuilt the head on the family minivan. I think it's safe to say that I didn't have a typical childhood. I was forced to grow up too fast.

I wasn't completely devoid of a father figure. Grandpa was a regular presence in my life until he died in 2020, and he was a great example of all the values I'd been raised with, and he was my childhood hero. He was always working on something for someone, volunteering his time and skills, studying scripture, or praying for

A

his family and community. Even in his last years he was always working engineering problems for friends and praying for his family.

I grew up in the shadow of Grandpa, who was a brilliant mechanical engineer, and my equally brilliant electrical engineer uncle and it was assumed that I was of course going to become a mechanical or electrical engineer like my dad, uncle, aunts, and grandfather were. I don't really know how much pressure that put on me, but it wasn't insignificant. I always felt like I was merely being tolerated or patronized because I was family. This was further reinforced because the only times I ever spent time with my extended family was either during the holidays when everyone was of course going to be there, or they needed my help with something. It was made worse when I was fired from a job that my uncle arranged for me at a friend's machine shop. I felt so guilty and ashamed about it. I don't think I spoke to my uncle for a month.

I've always been gifted with an ability to wrap my head around new concepts quickly, and pick up new skills inately. This gift was well accepted and encouraged by my family. Most Christmases and birthdays I would receive something to tear apart and learn from. And even in the interim, broken toys and appliances were always saved for me to scavenge parts from. As I got older, I stopped merely disassembling things to see how they work, and started being able to repair some of them too. Even now, If I'm bored I'll stop in a second hand shop, and browse for an interesting device to take home and explore.

Because of my interests, I started taking over many DIY tasks and maintenance at home, at church, for friends, family, and neighbors. It's incalculable how many hours I've spent, and continue to spend, supporting my church through running, maintaining and upgrading their technology. I really enjoy making life better for people, and if it gives me an excuse to play with some new technology, so much the better—I am an unabashed technophile. This intuitive familiarity with technology is also matched with an ability to communicate ideas in forms that lay people can understand. This combo has served me well through college and university as I helped other students with their various technological problems, or various homework problems. Even at work, I've created and presented several training materials, and received numerous commendations on my ability to convey the material in a clear and concise manner. I always start with the assumption that no one can know everything, and that learning can and should be fun. As long as people are willing and want to learn, I am happy to take whatever steps are necessary to help with understanding.

As I was making choices about my future schooling I eventually came to the choice of this new program "Computer Science and Engineering" This decision left me feeling sheepish as I imagined the disappointment of my family for not following in my relatives footsteps, but my grades weren't that great, and it was cheaper as I could live at home. As a final act of my degree I needed an internship, and my uncle connected me with a work friend. It would be an unfortunate and terrible experience. Despite meeting requirements and graduating, I was a wreck afterwards; I felt like a failure, and that I'd let down my uncle. Again.

I graduated at the height of the '09 recession, so I couldn't find any work. I tried to get into a masters program but my GRE scores were not high enough. Another failure. A buddy and I tried to start our own business as mobile computer tech support, but discovered we were lousy businessmen. Still more failures. How can I compare to my relatives?

I keep serving, because that's what I do, and I don't know what else to do. I enjoy helping people, but I also feel unnoticed, taken for granted, used. I am lonely. Outside of my family I have exactly 1 friend, but lots of acquaintances. I help, because it's what I do, but also, I help because I hope someday to be noticed and respected by the people I respect and admire. Maybe one day I'll get a patent, or my masters degree. Maybe someday I'll build the next mousetrap. Until then, I continue helping because it's what I know. Some people mirror their parents when they grow up. I desperately do not want to turn into my dad. I try not to be critical, I try to assume the best in people, I try to share words of affirmation whenever possible. I am not my dad. But

none of my role models were particularly adept at showing love outside of service, so how was I to know or learn? So I help, because it's what I know.

Then in 2012 I learned about The Geek Group (TGG). It seemed like a match made in heaven. A non-profit company whose ethos was to match people who wanted to learn with people who knew, as well as could provide facilities and resources to maximize the results. I loved it! I could share my knowledge, solve many new problems and make the world a better place. I was making a lot of friends, and I even eventually befriended the founder, Chris Boden. He came to rely on my skills in running and developing his company, and I idolized him in return. I was valued for my knowledge, trustworthiness, and loyalty ( and pocketbook, if we're being brutally honest). I idolized Chris because he was doing so many things I wished I could do, as well as building a place that if successful, I could build my dream job. Helping people, advising people, working on cool, ever changing projects, playing with cool technology, surrounded by people who seem to legitimately enjoy me and want to be around me. What more could I ask for?

Several people warned me about him, but I ignored them thinking they were just seeing the boisterous exterior and the overinflated negative press he had from some very vocal detractors. I thought he was great fun, and couldn't see the detractors as more than overreactions to some hurt feelings. After all, TGG was "a social group of social misfits" to use Chris's words--of course there would be some ruffled feathers. Chris thought I was a "turbo smart nerd" and a "rockstar". I was a trusted advisor.

Over the years I donated over $50,000 in funds and material to his company trying to solve problems and help it succeed. I wrote several scripts for his demos and videos; and flew out numerous times to help with projects in person. These visits were especially enjoyable as I got a chance to meet many friends that I normally only interacted with online.

When Bitcoin was making headlines in 2017, Chris came to me and asked about Bitcoin. We came up with a plan that fit well with the company ethos and could eventually solve the company's continuous money troubles. We'd sell Bitcoin. The principles behind Bitcoin--and cryptocurrencies in general--really appealed to Chris's anarchy streak, and mine too, frankly. The possibility of making a lot of money while deposing government controlled currency with one that was anonymous and decentralized, while teaching others about this new technology, all the while supporting his life dream company was too enticing to ignore.

Chris would teach people about Bitcoin, sell it to them at rates less than much of the market, using the profits to pay bills accrued by TGG, or reinvesting in our operation. I would be responsible for converting the US dollars from the sales back into Bitcoin, for my own small percentage of it. Not that I was in it for the money. I had a great job that paid well enough that I was usually able to buy whatever I wanted, whenever I wanted; so I just reinvested my profits back into our operation.

One of the first things we learned is that the exchange we were using (Coinbase) was allegedly being forced to watch Bitcoin transactions for 5 transactional hops and that if some of the Bitcoin we sold was used at the wrong place we could get our account terminated. This seemed wrong to us, and not wanting to have our accounts shuttered for the actions of someone 5 steps removed from us, I started "mixing" all the bitcoin I bought prior to Chris selling it. This was also supported by the crypto community in general for maximizing the anonymity of bitcoin. I did look around and couldn't find anything more than unsubstantiated rumors that there were any problems at all with this. This conclusion was reinforced because the IRS declared Bitcoin was property and was being taxed as such. This was the wild west and lawmakers were filing law changes left and right, so it was anyone's guess what the rules were today, let alone tomorrow. We figured it would be easier to ask forgiveness than to seek permission; and assumed that if we were indeed in the wrong somehow; that in the worst case we would get a nasty letter or unpleasant visit from an official, a cease-and-desist, and a fine.

We *were* playing with money and I suspected we'd need some legal paperwork to get bigger, so I asked Chris to talk with the company lawyer and get some input. Chris told me that we wouldn't need any as long as transactions were less than $1000. Anything larger would have to be a personal transaction with him "and we'd have to make sure they aren't a fed" That should have been a flag for me, especially because how would he know? But along with so many others, I justified it and rationalized it away, figuring that I was doing my best to follow the rules, what Chris did was his problem.

Chris would host semi-weekly classes on crypto, what it was, how to use it, how to safely store it, how to get it, etc. The front desk would sell to random people off the street, but serious investors would be handled by Chris personally. In keeping with the supposed anonymous nature of crypto, few questions were asked. If you had money, Chris was happy to sell.

There was one rule we were vaguely aware of: something to do with deposits in excess of $10,000. Chris became adamant that we couldn't deposit more than $5000/day, and he never did. That would prove limiting and I passively was trying to find ways to be able to expand our limits, as I knew that $5000/day was unsustainable, especially when Chris would sell well over $5,000 of bitcoin some days to his large investors. I also knew that I didn't want to get in trouble with the IRS, so I did my best to file taxes that included my gains and losses for all the bitcoin while it was in my possession.

I'd like to think that if I'd known the consequences could envelop me so easily I'd have done more or taken other steps, but I also think that I'd fallen sufficiently under Chris's spell that I don't know what I would have let him convince me to do or ignore, especially if it was a logical, and semi reasonable progression of events.

In December of 2018 I heard about the federal raid on the TGG facilities. Chris remained silent about what had happened, ostensibly on 5th amendment grounds. He did adamantly defend himself by saying that he hoped that the investigation was thorough, because it would show that he'd done nothing wrong. I believed him, as up to that point I'd not had any reason to doubt him. I did hear through the grapevine that it had something to do with bitcoin. He and I remained friends, but without the common ground of The Geek Group to tie us together, our friendship started faltering.

Then, in mid 2019, after losing TGG, family drama created another large loss. I soon realized I was dealing with two great losses in one year and I was now struggling with depression; so I started seeing a therapist. She was immensely helpful, helped me get started on some antidepressants, and ADHD meds, and helped me realize that I had many more layered issues that we also addressed. With her help, I started enjoying my life, and started accepting and reciprocating the friendship of many people who I formerly only thought of as acquaintances.

Early 2020, I got a knock on my door. Two agents handed me a notice that I was being investigated, and they wanted to have a chat. I politely informed them that I needed to speak with a lawyer first and they left. We ended up doing a proffer with the agents. During the proffer, several things were brought up that made me start questioning what I knew about Chris, and I started doubting my perception of Chris. Then finally, they showed me a little black book that had names across the tops of the pages, and what appeared to be bitcoin wallet word lists below. I recognized some of the names as some of the names Chris had dropped when we were discussing his investors' transactions. This stunned me and the penny finally dropped. There was no reason why Chris should have those wordlists. This also flew in the face of everything that Chris had preached regarding crypto security, etc. With them, he had unfettered, invisible, and untraceable access to ALL of his client's crypto holdings. I no longer trusted Chris, and started questioning *everything* associated with Chris. The more I was retrospective, the more red flags I realized I'd ignored, justified, or rationalized. My friends were right about him, and I was becoming ashamed that I'd spent so much time with him, and realizing that he was not someone I wanted to associate with, nor for him to be associated with me. I canceled my Patreon

subscription to him, unfriended and stopped following him on Facebook, and blocked him on reddit and twitter. I was done with him.

But it was too little too late. After the grand jury handed down it's indictment I realized I had my blinders on and because I'd placed Chris on an unjustified pedestal I was blindly trusting him and bypassing my better judgement. Things that would probably have at least raised an eyebrow were it under any other context, went completely ignored. I would like to think that I would have said or done something if something "worse" came up; but I came to the frightening and sobering realization that *I have no idea what I would have let Chris convince me to do.*

I am using my experience as a very personal example why one should be careful about who you associate with. It is said that "By your friends you will be known" and "Bad company corrupts good morals"  How true that is. I went from an esteemed Good Christian Boy with nothing more than a couple of old and minor traffic infractions, to a multicount felon in the blink of an eye.

I regret my participation in these crimes. I would like to think the outcome would have been different if I'd better known the rules; but I also readily concede that I left my good sense at the altar I'd made for Chris. Now that the veil has been lifted, I have had much soul-searching, retrospection, discussion with advisors, friends and family, and my therapist and have come to some conclusions that some may consider surprising. This conviction and sentence will be a sobering monument and lifelong reminder of my foolishness; but I'm also thankful for it. Through it, I have had my head cleared and any reasons and desire to associate with Chris have evaporated. Because of it I've come closer to Christ. Because of it, I've had a chance to learn who my real friends are and always have been; and all my friends and family have banded together and shown me just how much I actually mean to them. It turns out that all the people I thought were tolerating me were just unsure of how to show their love and respect, and my insecurities left me blind and suspicious.

It is trials like this that force a person to make an important choice. Turn to God, or curse Him. Through His Grace, I chose to trust God for support and guidance and have grown closer to Him. His goodness has used this case to rescue me from a very bad place and very bad company, and even helped me to see some more idols I never even realized I had. Even if I get handed the worst sentence possible, it will be worth it. "What good is it then to gain the whole world but to lose your soul?" I will continue forward trusting God that this was all necessary for my sanctification. I am much more secure in who and what I am. I am finally learning to believe people when they tell me, and show me that they love me. I am very secure and confident in my skills and knowledge and no longer feel the need to prove myself, as I finally believe my friends and family when they tell me I don't need to, and I have seen the respect and admiration my colleagues have for me and my work. I now see the love and respect I have from everyone I care about. I would be a fool to say that I'm now immune to the ego stroking that got me here, but so many of the things that allowed it to be such a vulnerability to me are significantly less of an issue now.

I am still looking to find someone I trust to mentor me, as I realize I have a very fragmented and distorted view of what a Godly Christian man should look like and I want to be a better role model than what I had.


Your Honor,

I thank you for your time in reading this letter. I admit it is rather lengthy. I want to be respectful of your time and I tried to only include that which I thought was necessary to help you understand who I am.

I recognize that ignorance, coercion, and misplaced trust are no excuses for breaking the law; clearly, I *am* guilty of breaking the law. I have always tried to do my best to follow the laws of this land and I have always been willing to accept full responsibility for my actions should I be found guilty of breaking any. I regret and am

ashamed of my part in these crimes, and am even more ashamed of the lapses in judgment that brought me here.

I humbly accept any consequences you may deem necessary. I only pray that through this letter and the others sent by my friends and family, you can see where my heart was and now is and what I mean to so many people and will have mercy on me in my sentence.

With all respect, and humbleness,

Daniel Reynold DeJager

*[signature]*   1-27-2022